JOHNSON, Respondent v. NORFOLK, Appellant

(82 N.W.2d 656)

(File No. 9607. Opinion filed April 30, 1957)

**Woods, Fuller, Shultz & Smith** and **H. L. Fuller,** Sioux Falls, for Defendant and Appellant.

**Davenport, Evans, Hurwitz & Smith,** Sioux Falls, for Plaintiff and Respondent.

RENTTO, J. This is an action for damages for injuries sustained by plaintiff in an automobile accident. She was riding in a car driven by her husband when it was involved in a collision with a car driven by the defendant. As one defense it is urged that plaintiff had compromised and settled the claim sued on and had released defendant from all liability therefor. In reply, plaintiff claimed that the release relied on was invalid because it had been obtained by fraud and misrepresentation.

On motion of the defendant the issues raised concerning the release, pursuant to SDC 33.1303, were tried separately by the court. It concluded that no contract of settlement had been entered into because plaintiff's offer to compromise had not been accepted and that even if it had been, there existed a mutual mistake of fact justifying its rescission. An order was entered determining the issues concerning this defense in favor of the plaintiff. Defendant, upon permission granted, appeals from that order.

In the accident which occurred on November 9, 1955, on U. S. Highway No. 16, about three miles east of Plankinton, South Dakota, plaintiff and her husband, both residents of Platte, South Dakota, were injured. They were taken to a hospital at Mitchell, South Dakota. Mr. Johnson was discharged from the hospital after three days but plaintiff was not released until November 30th. Shortly after his

discharge the husband contacted his insurance carrier in Sioux Falls and settled for the collision damage to his automobile. On the same trip he contacted the Sioux Falls office of the company which had insured the defendant against public liability, concerning claims that he and his wife were asserting against the defendant. That office engaged the services of an adjustment firm in Mitchell to investigate the collision and their claims.

A representative of this firm called on the plaintiff at the hospital and while there also talked with her husband. Plaintiff's husband called at the firm's office on four or five occasions after that for the purpose of negotiating a compromise of their claims. She was with him on several of these occasions after her release from the hospital and participated in the discussions. Their last discussion was on December 15 when they executed and delivered the release here involved. The release was signed only by the plaintiff and her husband. It is evident from the instrument that the party being released was not expected to sign it. It released the defendant from all claims of the plaintiff and her husband arising out of the accident, and recited that it was a compromise of doubtful and disputed claims and that it was contractual and contained the entire agreement between the parties. While it acknowledged receipt of the sum agreed on nothing was paid thereon.

In the course of these negotiations the issue of plaintiff's damage developed rather slowly, and somewhat piecemeal. Her husband's efforts to submit lists showing the items of claimed damage necessitated several meetings because the cost of all the items was not known until her medical treatments had terminated. Some of the negotiations took place when she was in Mitchell consulting with her doctors. One item in serious dispute concerned the fact that plaintiff's eyes and ears would require further examination and she would have to be fitted with glasses. The amount for this item was eventually agreed on by compromise. Plaintiff also mentioned her pain and suffering but the adjuster refused to make any allowance therefor. The negotiations also disclosed that the insurance policy, which plaintiff's husband had on his car, provided limited medical coverage for him-

self and the plaintiff. As to this feature, the negotiations were concerned with whether the amount payable under this policy provision should be deducted from the agreed damages in determining the sum to be paid by defendant's insurer. The collision also damaged some personal property in Mr. Johnson's car belonging to his employer. This feature was negotiated as a separate item and does not concern the release in issue.

In culmination of these negotiations the adjusters expressed a willingness to pay a definite amount. The major portion of this was for plaintiff's damage, but it also included items of damage suffered by her husband. This figure allowed for a deduction from the total agreed damages of the amount recoverable under the medical coverage of Mr. Johnson's policy. It was a policy issued by the Central Standard Insurance Company. At the time of executing and delivering the release in question the parties all believed that these amounts would be paid under that policy. After its completion the executed release was sent to the Sioux Falls office of the defendant's Insurance Company. That evening news dispatches in the daily papers told of financial difficulties in which the Central Standard Insurance Company was involved and of efforts to have a receiver appointed to take over the affairs of the company. Nothing has been paid or tendered by that company under its policy. Apparently it is insolvent.

On the following day plaintiff engaged legal counsel. Five days later these lawyers wrote the adjustment firm asking for a return of the release and advising that plaintiff would return any draft tendered in payment of the purported settlement. The reason given was that it had been signed under a mistaken apprehension of their rights and by reason of assurances made that they would collect under their policy with Central Standard. The adjusters had received the draft for delivery when this letter was received but did not deliver it because of her announced intention to return it. Defendant's insurance carrier declined to surrender the release and tendered payment of the amount called for by the release and of the additional sum which it had been expected would be paid by Central Standard.

These amounts were retendered in the defendant's answer. The trial court was of the view that the execution of the release by the plaintiff was only an offer to compromise which she revoked before it had been accepted by payment of the amount recited therein.

Plaintiff and her husband were the only witnesses for her. Concerning what took place when the release was signed and delivered, and just prior thereto, she testified as follows:

On direct examination:

"Q. Go ahead and tell us what took place after Mr. Carlson and Mr. Clemenson came back into the room? A. Mr. Clemenson and Mr. Carlson asked us if we were ready to sign and my husband said yes."

On cross-examination:

"Q. And during the day I take it they had offered to pay you this total that has been mentioned of some $1,421.94? A. Yes.

"Q. And finally after this session in the afternoon in which you and your husband were together, he called them in and said that you would take it? A. That we would sign the release, Yes.

"Q. And that you would take that amount? A. The amount that was on the releases?

"Q. Yes. Did he say that? A. He said we would sign them, yes.

"Q. And that you would take that amount? A. Well, that was understood by signing the releases."

Mr. Johnson testified as follows:

On direct examination:

"Q. Anything else said before the release was signed? A. He then asked—Mr. Clemenson then asked if we were ready to sign the release and I told Mr. Clemenson that we would like to think this over—Mrs. Johnson and I would like to think this over, and Mr. Clemenson asked Mr. Carlson to step out of the room, and I told Mr. Clemenson, 'It's about time for lunch—we'll go out to lunch,' and Mr. Clemenson said, 'Can you be back at one-thirty?' and I told him yes, and Mrs. Johnson and I left."

On cross-examination:

"Q. And you discussed the claim that morning? A. Yes, sir.

"Q. And some place along the line Clemenson or Carlson told you they would pay the amount specified in the releases? A. Yes, sir .

"Q. And you and your wife went out to lunch or dinner and discussed that yourselves privately? A. Yes, sir.

"Q. And you came back and discussed it further? A. Yes, sir.

Q. And then you again discussed it privately the latter part of the afternoon? A. Yes, sir.

"Q. And finally after this discussion you told them you would take that amount? A. Yes, sir.

"Q. And signed the releases? A. Yes, sir."

Other testimony by the plaintiff and her husband does not dispute this version of the transaction. Nor does that on behalf of the defendant. We must view all of this testimony in the light most favorable to her, bearing in mind, however, that she is bound by her own statement of the undisputed facts and cannot make a stronger case than her testimony establishes. Ford v. Robinson, 76 S.D. 457, 80 N..W2d 471. When so viewed and considered we think it conclusively shows that an offer to compromise was made by the adjusters when they presented the release to her for her signature and that it was accepted by the plaintiff when she signed and delivered the release.

■■ Referring to contracts of this type, 11 Am.Jur., Compromise and Settlement, Sec. 16, states the rule thus: "There must be a definite proposition and an acceptance in order to effect a compromise. As a question of law it does not matter from whom the proposition of settlement comes; if one is made and accepted, it constitutes a contract and, in the absence of fraud, it is binding on both parties." See also 15 C.J.S., Compromise and Settlement § 7 and State Bank of Alcester v. Ryan, 49 S.D. 14, 205 N.W. 664. The plaintiff could not destroy this agreement by refusing to

accept the draft. She is bound by it. Chicago T.H. & S.E. Ry. Co. v. Meurer, 187 Ind. 405, 119 N.E. 714. By this release the plaintiff in good faith gave up a claim in which the amount of damages was in dispute. This furnishes a sufficient consideration for the promise to pay made on behalf of the defendant. SDC 10.0501; Norman v. Miller, 40 S.D. 399, 167 N.W. 391; Crilly v. Morris, .70 S.D. 153, 15 N.W.2d 742; Segal v. Allied Mutuals Liability Ins. Co., 285 Mass. 106, 188 N.E. 504; Addison Miller v. American Cent. Ins. Co., 189 Minn. 336, 249 N.W. 795; Williams v. New Brunswick Fire Ins. Co., 172 Okl. 135, 45 P.2d 127, 57 A.L.R. 279. It is binding on both parties even though the payment of the money remained to be performed. Hofland v. Gustafson, 132 Cal.App.2d Supp. 907, 282 P.2d 1039; Fair Mercantile Co. v. Union-May-Stern Co., 359 Mo. 385, 221 S.W.2d 751; Landau v. St. Louis Public Service Co., Mo. App., 267 S.W.2d 364, Id., 364 Mo. 1134, 273 S.W.2d 255.

In Hofland v. Gustafson, supra, [132 Cal.App.2d Supp. 907, 282 P.2d 1041] it is written "In ascertaining the legal effect of a release, one must look to the instrument itself to determine the intent of the parties. Such an instrument is ordinarily presently operative once the maker has signed and delivered the writing. (Restatement of Contracts, section 402, comment b.) 'The non-payment of the consideration did not affect the operative effect of the instrument as a valid release. The obligation to pay the consideration is created by the acceptance of the release.' Paige v. O'Neal, 1859, 12 Cal. 483, 496." As above indicated we subscribe to this rule. A somewhat different view seems to have been taken in Benson v. Metropolitan Casualty Ins. Co. of N. Y., La.App., 79 So.2d 345. The contrary result reached in Brennan v. Fuller, 1 Misc.2d 765, 147 N.Y.S.2d 759, seems to flow from a statute which we do not have.

The Hofland case further holds that: "Mere delay in performing a contract is not considered a substantial breach, justifying rescission, unless the delay is such as to warrant the conclusion that he does not intend to perform." Such conclusion is unwarranted under the circumstances here present. It was the understanding of the parties that payment would be made by draft sent from the Sioux Falls

office after it received the release. Since the agreement did not provide a definite time for doing this the law implies its performance within a reasonable time. Boekelheide v. Snyder, 71 S.D. 470, 26 N.W.2d 74. That was done.

■■ The law favors the compromise and settlement of disputed claims. Erickson v. Weber, 58 S.D. 446, 237 N.W. 558, 80 A.L.R. 914. However, such agreements are subject to rescission for the same reason as other contracts. SDC 10.0802; Nilsson v. Krueger, 69 S.D. 312, 9 N.W.2d 783. In this record there is no finding by the court concerning fraud or misrepresentation as claimed by plaintiff in her reply. On the issue of rescission the court found only that when the agreement was entered into both parties were under the mistaken belief that certain payments would be made to the plaintiff by Central Standard Insurance Co. as above set out. It concluded that this was a mutual mistake of a material fact on the part of the parties to the negotiations, which would justify a rescission of a contract, had any contract ever been entered into.

■ In addition to the mistake found by the court, we have, in this case, the added feature that the defendant had tendered payment of the additional amount of money which the parties believed plaintiff would get from Central Standard. Concerning this feature, Restatement, Contracts, Sec. 502, states the following principle:

"Even though there is no such mistake as would deprive the acts of the parties of any effect on their contractual relations under the rules stated in sections 49, 71, 456, where parties on entering into a transaction that affects their contractual relations are both under a mistake regarding a fact assumed by them on the basis on which they entered into the transaction, it is voidable by either party if enforcement of it would be materially more onerous to him than it would have been had the fact been as the parties believed it to be, except * * *

(c) where it is possible by compensation to the party injured by the mistake to put him in as good a position as if the transaction had been what he supposed it to be, and such compensation is given."

Defendant's tender removes any prejudice the plaintiff would have suffered. In our view it deprives her of any

right of rescission that she might otherwise have had by reason of such mistake.

Reversed.

All the Judges concur.